**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KAMAL ABDALMAAGID ABDALLA, | : | Civil No. 1:25-CV-00195 |
| Petitioner, | : | |
| v. | : | |
| TODD BLANCHE[1], *et al.*, | : | |
| Respondents. | : | Judge Jennifer P. Wilson |

# MEMORANDUM

This matter is before the court on the parties' cross motions for summary judgment. (Docs. 18, 24.) United States Customs and Immigration Services (USCIS) denied Petitioner and lawful permanent resident Kamal Abdalmaagid Abdalla's ("Abdalla") application for naturalization. (Doc. 25, ¶ 11.) USCIS reasoned that Abdalla could not make the requisite showing of good moral character because he had previously been convicted of an aggravated felony. (*Id.*)

Abdalla petitioned this court for a *de novo* review of his naturalization application and named the Attorney General of the United States, the Secretary of the Department of Homeland Security, the Philadelphia District Director of USCIS, and the Department of Homeland Security (collectively, "the Government") as respondents. (Doc. 1.) He argues he was not convicted of an

[1]Pursuant to Federal Rule of Civil Procedure 25(d), the court substitutes the successor officer for the office of Attorney General of the United States.

aggravated felony and can therefore demonstrate good moral character. (*See* Doc. 19, pp. 15–27.) For the reasons that follow, the court will grant Respondents' motion for summary judgment, Doc. 24, deny Abdalla's motion for summary judgment, Doc. 18, and deny Abdalla's petition, Doc. 1.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Abdalla was born in 1972 in the country then known as Sudan. (Doc. 18-1, ¶ 1.) He survived war-related violence; when he was thirteen years old, he was captured, enslaved, and tortured. (*Id.* ¶ 2.) He suffered severe psychological injuries as a result. (*Id.*) Abdalla entered the United States through New York City in 2000 as a refugee. (*Id.*) He has held lawful permanent resident status in the United States since that date. (Doc. 25, ¶ 3.)

On December 1, 2006, in a Benton County, Washington, liquor store, Abdalla took a bottle of liquor without paying for it and "raised it over his head in a threatening manner toward the store clerk." (Doc. 18-1, ¶ 3.) He was charged with Robbery in the Second Degree in the District Court of the State of Washington, Benton County in January 2007. (Doc. 25, ¶ 5 (citing Wash. Rev.

[2] Many of the facts in this case are not disputed. (*Compare* Doc. 18-1 *with* Doc. 25.) Moreover, Plaintiff specifically concurred with the Government's statement of material facts in support of its motion for summary judgment, Doc. 25. (Doc. 30, ¶ 1.) Where the facts are not disputed, the court cites either to Abdalla's statement of undisputed material facts in support of his motion for summary judgment, Doc. 18-1, or the Government's statement of undisputed material facts in support of its motion for summary judgment, Doc. 25. The court also cites to the administrative record in this case, Doc. 16. The court notes when the parties dispute certain facts.

Code §§ 9A.56.190, 9A.56.210)). In February of that year, he pleaded guilty to an amended criminal complaint that charged him with Theft in the Third Degree under Wash. Rev. Code. § 9A.56.050 and Assault in the Fourth Degree under Wash. Rev. Code § 9A.36.041. (*Id.* ¶ 6.)[3] The Court sentenced Abdalla to 365 days of incarceration with 335 days suspended for each offense the same day. (*Id.* ¶ 7; Doc. 16, pp. 11, 210.)

Abdalla applied for naturalization twice. (Doc. 25, ¶¶ 9–10.) The Government denied his first application in 2012. (*Id.* ¶ 9.) The first denial was because Abdalla's theft conviction qualified as a crime of moral turpitude and he was convicted of that crime less than six years before filing his naturalization application. (Doc. 18-1, ¶ 5; Doc. 16, p. 298 (citing 8 C.F.R. § 316.10(b)(2)(i).)[4] Therefore, he could not demonstrate good moral character at that time. (Doc. 16, p. 298.)

[3] The court refers to these convictions as Abdalla's "theft conviction" and his "assault conviction," respectively. Moreover, Abdalla consistently refers to his theft conviction as occurring in 2006. (*See* Doc. 18-1, ¶ 6.) However, the page of the administrative record to which Abdalla cites, Doc. 16, p. 210, and the Government's statement of facts to which Abdalla agreed, both reflect that Abdalla pleaded guilty and was sentenced in 2007. (Doc. 16, p. 298.)

[4] For ease of reference, the court uses the page numbers included in the CM/ECF header.

Abdalla applied for naturalization again in 2018. (Doc. 25, ¶ 10.)[5] The second application was denied in 2019. (*Id.*; Doc. 16, p. 692.) The second denial was because Abdalla's theft conviction qualified as an aggravated felony conviction under 8 U.S.C. § 1101(a)(43)(G). (Doc. 25, ¶ 11; Doc. 16, p. 694.) Therefore, he could never demonstrate the good moral character required for naturalization. (Doc. 16, p. 694; Doc. 18-1, ¶ 7); *see* 8 U.S.C. § 1101(f)(8). Abdalla requested a hearing and appealed that decision. (Doc. 25, ¶ 12; Doc. 16, p. 688.) USCIS held a hearing on his appeal on September 22, 2021. (Doc. 16, p. 678.) The USCIS affirmed its denial of Abdalla's second naturalization application. (Doc. 25, ¶ 12; Doc. 16, pp. 678–680.)

Abdalla petitioned this court for a *de novo* review of the USCIS's denial of his second naturalization application under 8 U.S.C. § 1421(c) on February 3, 2025. (Doc. 1, ¶ 6.) The Government filed a response to that petition on April 8, 2025, and the administrative record on September 30, 2025. (Docs. 12, 16.) On October 29, 2025, Abdalla filed a motion for partial summary judgment, a statement of undisputed material facts, and an accompanying brief in support. (Docs. 18, 18-1, 19.) Therein, Abdalla argues that his theft conviction does not qualify as an aggravated felony under 8 U.S.C. § 1101(f)(8), so the court should

[5] Immigration officials arrested Abdalla in 2017 and placed him in removal proceedings. (Doc. 18-1, ¶ 6.) But the Government dismissed the removal charges against him because "the Notice to Appear was improvidently issued." (*Id.*)

grant him naturalization. (Doc. 19, pp. 15–27.) The Government filed a brief in opposition to that motion and a counter-statement of undisputed material facts on December 12, 2025, Docs. 22 and 23, and Abdalla did not file a reply.

The Government filed a motion for summary judgment, a statement of undisputed material facts, and an accompanying brief in support on December 12, 2025. (Docs. 24, 25, 26.) Therein, it argues that USCIS correctly categorized Abdalla's theft conviction as an aggravated felony, so the court should affirm USCIS's decision to deny Abdalla's second naturalization application. (Doc. 26, p. 14.) Abdalla filed a brief in opposition to the Government's motion for summary judgment and an answer to its statement of facts, Docs. 27 and 30, and the Government filed a reply brief, Doc. 29.

On July 2, 2026, the court ordered supplemental briefing on the issue of whether the statute under which Abdalla was convicted and the Washington statute defining the term "theft" were divisible. (Doc. 31, pp. 1–2.) Both parties filed supplemental brief in response to the court's order. (Docs. 32, 36.) Therefore, both motions for summary judgment are ripe for disposition.

## JURISDICTION AND VENUE

Abdalla asks the court to conduct a *de novo* review of the USCIS's denial of his second naturalization application under 8 U.S.C. § 1421(c). (*See* Doc. 1, ¶ 6.) That section of the statute provides:

> A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c). In *Al-Hasani v. Secretary of the United States Department of Homeland Security*, the United States Court of Appeals for the Third Circuit recognized that a district court had jurisdiction under § 1421(c) after the petitioner requested a hearing on USCIS's denial of his naturalization application "as permitted by 8 U.S.C. § 1447(a)," the USCIS affirmed its decision, and the petitioner filed for a review of that denial in the district court that had jurisdiction over his residence. 81 F.4th 291, 294, 295 n.1 (3d Cir. 2023).

Abdalla's second naturalization application followed the same process, and he has satisfied the conditions set forth in § 1421(c), so the court has jurisdiction over his petition. Specifically, USCIS denied Abdalla's second application for naturalization, and he appealed that decision on December 15, 2019. (Doc. 25, ¶¶ 11–12.) The USCIS decision contained in the administrative record notes that Abdalla "filed a Form N-336 Request for a Hearing on a Decision in Naturalization Proceedings . . . ," and that "[a]fter a thorough review of [the] record, USCIS reaffirm[ed] the decision to deny [Abdalla's] Form N-400 . . . ." (Doc. 16, p. 678.) (*Id.*) Moreover, the USCIS decision informs Abdalla that he may "request judicial

review of this final determination by filing a petition for review in the United States District Court having jurisdiction over [his] place of residence." (*Id.* at 679–80.)

Additionally, Abdalla states in his petition that he is a resident of Cumberland County, Pennsylvania, which is subject to this court's jurisdiction. (Doc. 1, ¶ 2.) The Government does not dispute that this court is "the United States district court for the district in which" Abdalla resides. § 1421(c). (*See* Doc. 25, ¶¶ 1–12.) Consequently, the court has jurisdiction to review USCIS's denial of Abdalla's application, and venue is proper in this district. (*Id.*)[6]

## STANDARDS OF REVIEW

### A. Summary Judgment

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law."

[6] The court did not hold a separate hearing on Abdalla's petition or motion for partial summary judgment. Section 1421(c) requires the court to, "at the request of the petitioner, conduct a hearing de novo on the [naturalization] application." Abdalla titled his petition: "Petition for De Novo Hearing on Naturalization Application," Doc. 1, but he does not address his request for a hearing anywhere in his original petition or in his brief in support of his motion for partial summary judgment, Doc. 19. Moreover, a panel of the Third Circuit has recognized, albeit in a non-precedential opinion, that a district court need not hear oral argument before deciding a motion for summary judgment in a case involving an appeal of a denial of naturalization under § 1421(c). *Abulkhair v. Bush*, 413 F. App'x 502, 507 n.4 (3d Cir. 2011) (per curiam), *cert. denied*, 563 U.S. 979 (mem.).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or

denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Application for Naturalization and Review of Naturalization Application Denials

An individual seeking naturalization must prove, by a preponderance of the evidence, that they meet the requirements for naturalization, and strict compliance with those requirements is necessary. *Al-Hasani*, 81 F.4th at 295 (quoting *Saliba v. Att'y Gen.*, 828 F.3d 182, 189 (3d Cir. 2016)). The court resolves doubts about granting citizenship in favor of the Government and against the applicant. *Id.* (quoting *Saliba*, 828 F.3d at 189). Under 8 U.S.C. § 1421(c), the court reviews

naturalization denials de novo and may make its own findings of fact or conclusions of law; it is not bound by the administrative record. *Haser v. Brown*, No. 18-1383, 2020 WL 907155, at *5 (W.D. Pa. Feb. 25, 2020) (first quoting 8 U.S.C. § 1421(c); and then quoting *Saliba*, 828 F.3d at 189), *aff'd*, 844 F. App'x 554 (3d Cir. 2021) (per curiam).

## DISCUSSION

The parties' cross-motions for summary judgment present a legal issue: whether Abdalla's theft conviction qualifies as an aggravated felony under 8 U.S.C. § 1101(a)(43)(G) and therefore prevents him from showing the good moral character necessary for naturalization, 8 U.S.C. § 1427(a). *See* § 1101(f)(8); (Doc. 19, p. 10 (noting that "[h]ere, the parties have not identified any disputed issues of material fact").) Before the court analyzes that dispute, it explains some relevant aspects of the naturalization process.

Under the Immigration and Nationality Act ("INA"), a naturalization applicant must satisfy certain residency requirements. 8 U.S.C. § 1427(a). The applicant bears the burden of showing they are eligible for citizenship. *Savane v. Sec'y United States Dep't of Homeland Sec.*, 164 F.4th 93, 98 (3d Cir. 2026) (quoting *Berenyi v. Dist. Dir., Immigr. & Naturalization Serv.*, 385 U.S. 630, 637 (1967)). Relevant here, the applicant must prove they are "a person of good moral character . . . ." 8 U.S.C. § 1427(a). An applicant cannot demonstrate good moral

character if, at any time, they have been "convicted of an aggravated felony." *Id.* § 1101(f)(8). A conviction, in this context, means:

> (A) . . . with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where–
>
> > (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
> >
> > (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.
>
> (B) Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

*Id.* § 1101(a)(48)(A)–(B). Both state and federal crimes can qualify as aggravated felonies. *Id.* § 1101(a)(43). One type of aggravated felony is a "theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [sic] at least one year . . . ." *Id.* § 1101(a)(43)(G).

USCIS denied Abdalla's second naturalization application because it found Abdalla's theft conviction qualified as an aggravated felony; he was convicted of a theft offense and sentenced to imprisonment for one year. (Doc. 25, ¶ 11; Doc. 16, pp. 678–680.) Therefore, USCIS found he could not prove good moral character. (Doc. 16, p. 679 (citing 8 U.S.C. § 1101(f)(8)).)

Here, the Government argues USCIS's decision is correct and Abdalla's theft conviction is an aggravated felony. (Doc. 26, p. 14.) Abdalla argues his conviction does not count as an aggravated felony. (*See* Doc. 19, pp. 15–23.) To decide who is correct, the court first determines whether Abdalla's state theft conviction qualifies as a "theft offense" under federal law. 8 U.S.C. § 1101(a)(43)(G). If it is, the court will then determine whether Abdalla was sentenced to one year of imprisonment for that conviction. *See id.* §§ 1101(a)(43)(G), (48)(A)–(B). If he was, he committed an aggravated felony, he cannot demonstrate good moral character, and USCIS properly denied his naturalization application. *Id.* § 1101(f)(8).

### A. Abdalla's Washington Theft Conviction Qualifies as a Theft Offense Under 8 U.S.C. § 1101(a)(43)(G).

The relevant section of the INA does not define theft, so the court may apply the "categorical approach" to decide whether Abdalla's state theft conviction qualifies as a "theft offense" under 8 U.S.C. § 1101(a)(43)(G). *Baghdad v. Att'y Gen. of United States*, 50 F.4th 386, 388 (3d Cir. 2022) (using the categorical approach to analyze whether Pennsylvania's retail theft statute qualified as a theft offense under 8 U.S.C. § 1101(a)(43)(G)).

That approach requires the court to compare the statute at issue with "how 'the criminal codes of most States' and the federal government generically use 'the term "theft"'" to determine whether the statute's elements match those of the

generic federal offense referenced in, for example, the INA. *Id.* (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 189–90 (2007)). The court applies the categorical approach differently depending on whether the statute is "indivisible" or "divisible." *Pesikan v. Att'y Gen.*, 83 F.4th 222, 227–28 (3d Cir. 2023). Therefore, the court explains the difference between those types of statutes, categorizes the Washington statutory framework at issue as indivisible, and then applies the categorical approach to determine whether Abdalla's theft conviction under that statutory framework is a theft offense under 8 U.S.C. § 1101(a)(43)(G).

**1. The Parties Agree That the Statutes at Issue Are Indivisible.**

Some state criminal statutes are "indivisible," meaning they set forth "multiple means of accomplishing a single offense." *Pesikan*, 83 F.4th at 227. When a statute is indivisible, the court applies the standard categorical approach, meaning it asks whether "the minimum conduct criminalized by the state-law offense" categorically matches the federal generic definition for that crime. *K.A. v. Att'y Gen. of U.S.*, 997 F.3d 99, 108–09 (3d Cir. 2021). In this approach, the court only compares the elements of the state-law crime and those of the generic federal offense, it does not consider "the individual facts associated with the state-law offense committed by the defendant . . . ." *Id.* at 109 (citing *Mathis v. United States*, 579 U.S. 500, 503–505 (2016).)

Other state criminal statutes are "divisible," meaning that they contain "definitions of more than one crime and [are] thus susceptible to being analytically divided into those separate definitions . . . ." *Pesikan*, 83 F.4th at 227 (citing *Descamps v. United States*, 570 U.S. 254, 257 (2013)). A statute is divisible if it "defines multiple crimes by listing elements in the alternative, whether in the disjunctive or in separate subsections." *Id.* (quoting *Mathis v. United States*, 579 U.S. 500, 505 (2016)) (citation modified). When the court must determine whether a divisible state statute matches a generic federal offense, it employs the "modified categorical approach," which is merely a "tool for implementing the categorical approach." *Id.*; *Singh v. Att'y Gen.*, 839 F.3d 273, 279 n.2 (3d Cir. 2016) (quoting *Descamps*, 570 U.S. at 262). Under the modified categorical approach, the court may examine specific documents, like the plea agreement, to determine which of the crimes listed in the statute the individual committed for the purpose of matching that crime to a federal offense. *Pesikan*, 83 F.4th at 227.

The court defers to a ruling from the state's highest court as to whether a statute lists alternative means of committing a crime or, in the alternative, separate elements of distinct crimes, and considers similar rulings from lower state courts as well. *Id.* at 227–28 (quoting *Singh*, 839 F.3d at 283 n.5).

Abdalla pleaded guilty to theft in the third degree in violation of Wash. Rev. Code § 9A.56.050 (2006).[7] (Doc. 25-1 ¶ 6.) At the time of Abdalla's conviction, that statute read:

> A person is guilty of theft in the third degree if he or she commits theft of property or services which (a) does not exceed two hundred and fifty dollars in value, or (b) includes ten or more merchandise pallets, or ten or more beverage crates, or a combination of ten or more merchandise pallets and beverage crates.

Wash. Rev. Code § 9A.56.050 (2006). It also defined theft in the third degree as a gross misdemeanor. *Id.* But a different statute defined the singular term "theft" as follows:

> (a) To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services; or
>
> (b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services; or
>
> (c) To appropriate lost or misdelivered property or services of another, or the value thereof, with intent to deprive him or her of such property or services.

[7] The court cites the 2006 edition of the Revised Code of Washington because the Washington State Legislature amended § 9A 56.050 in 2009, after Abdalla's conviction. 2009 Wash. Sess. Laws 2187. That amendment raised the third-degree theft monetary value threshold from $250 to $750 and thus has no impact on the court's analysis of the immigration consequences of Abdalla's conviction. *Id.* Washington's theft-defining statute, § 9A.56.020, has not been amended since Abdalla's 2007 conviction. *Compare* Wash. Rev. Code § 9A.56.020 (2006) *with* Wash. Rev. Code § 9A.56.020 (2026). Neither statute was amended between 2006 and 2008. *Compare* Wash. Rev. Code § 9A.56.020 (2006) *and* Wash. Rev. Code § 9A.56.050 (2006) *with* Wash. Rev. Code § 9A.56.020 (2008) *and* Wash. Rev. Code § 9A.56.050 (2008).

Wash. Rev. Code § 9A.56.020(1) (2006). The Government initially argued that the above Washington theft statutes, Wash. Rev. Code § 9A 56.050 (2006); Wash. Rev. Code § 9A.56.020(1) (2006), taken together, are divisible, and that the court should apply a modified categorical approach to determine whether Abdalla's conviction counts as an aggravated felony. (Doc. 26, pp. 18–19.) Abdalla did not clearly address the divisibility of the statute, but urged the court to apply the modified categorical approach. (Doc. 27, pp. 9–10.) In their supplemental briefs addressing the divisibility question, the parties agreed that the two statutes at issue, Wash. Rev. Code § 9A.56.050 (2006); Wash. Rev. Code § 9A.56.020(1) (2006), are indivisible, and the court should apply the categorical approach. (Doc. 32, p. 1; Doc. 36, p. 2.)[8]

Although Abdalla was convicted under § 9A.56.050 (2006), the crux of the divisibility issue is § 9A.56.020(1) (2006), because that statute lists different types of theft that could each form the basis of the term "theft" in § 9A.56.050 as either differing means or elements. *See K.A.*, 997 F.3d at 109–110 (applying the categorical approach to eight different state theft statutes because any of them could have formed the basis for the petitioner's robbery conviction under a

---

[8] Neither party argues that a divisibility analysis of the third-degree theft statute, Wash. Rev. Code § 9A.56.50 (2006), matters to this case or is relevant where the different varieties of theft under Washington law are set forth in a separate statute: Wash. Rev. Code § 9A.56.020 (2006).

different statute). The court notes that the divisibility of Wash. Rev. Code § 9A.56.020(1) has been analyzed on at least one other occasion in *United States v. Juarez-Gonzalez*, 451 F. App'x 387, 391 (5th Cir. 2011). In that non-precedential opinion, a panel of the United States Court of Appeals for the Fifth Circuit acknowledged the divisibility analysis and noted that the district court applied the modified categorical approach, but it did not conduct its own divisibility analysis or explicitly hold that an almost identical, previous version of Wash. Rev. Code § 9A.56.020(1) was divisible. *Juarez-Gonzalez*, 451 F. App'x at 390–93 (analyzing Wash. Rev. Code § 9A.56.020 (1998)); *see also United States v. Cazaras*, No. 4:15-CR-6024, 2015 WL 5838826, at *4–5 (E.D. Wash. Oct. 7, 2015) (analyzing the divisibility of a municipal code section that copied Wash. Rev. Code § 9A.56.020(1) and finding that, although the municipal code section itself was divisible into three parts, the individual subsections of the code were not further divisible).

In *Pesikan*, the Third Circuit emphasized that "it is important to determine whether a statute merely sets forth multiple means of accomplishing a single offense and is thus indivisible, or instead sets forth different crimes, with their different elements, and so is divisible." 83 F.4th at 227–28. The court explained that, to answer this "means-or-elements" question, courts should defer to "authoritative" sources of state law, such as a holding from the state's highest

court, or decisions from the lower court of a state that do not appear to conflict with how the state's highest court would ultimately rule on the issue at hand. *Id.* at 228 (quoting *Singh*, 839 F.3d at 283 n.5).

So the court looks to Washington state courts' interpretation of Wash. Rev. Code § 9A.56.020 (2006). In *State v. Linehan*, 56 P.3d 542, 545 (Wash. 2002), the Washington Supreme Court recognized that theft is an "alternative means crime." *Id.* at 546. And it recognized that, to convict the defendant in that case of first-degree theft, the jury needed only to be "unanimous as to whether Linehan committed theft by wrongfully obtaining, exerting unauthorized control, or obtaining the money by color and aid of deception. Unanimity is not required if there is substantial evidence supporting each of these alternative means." *Id.* at 547.

The Washington Supreme Court again examined § 9A.56.020 in *State v. Woodlyn*, 392 P.3d 1062, 1065 (Wash. 2017) (en banc). In that case, the "to convict" jury instruction at the defendant's trial informed the jury that it could convict the defendant if he "wrongfully obtained" the property at issue or if he obtained control over the property at issue "by color or aid of deception." *Id.* at 1064. Thus, the instruction told the jury it could convict defendant if it found him guilty of committing theft via two separate alternative means listed in § 9A.56.020. *See id.* The court noted that:

> In enacting criminal statutes, the legislature may articulate a set of prohibited behaviors as (1) a list of distinct offenses or (2) a single offense with one or more alternative means. *See*, *e.g.*, *State v. Peterson*, 168 Wash.2d 763, 769, 230 P.3d 588 (2010). The criminal act charged in this case, theft in the second degree, is an alternative means crime. *See, e.g., State v. Linehan*, 147 Wash.2d 638, 644-45, 56 P.3d 542 (2002) (noting that theft by wrongful obtainment and theft by deception are alternate means).

*Id.* at 1066. The defendant argued that the instruction violated his state constitutional right to a unanimous jury verdict because it was not clear which alternative means of theft the jury found he had committed. *Id.* at 1067. The court ultimately affirmed his conviction because "both alternative means [were] supported by a common set of facts." *Id.* at 1068.[9]

Based on the Supreme Court of Washington's holdings in *Lenihan*, 56 P.3d at 546, and *Woodlyn*, 392 P.3d at 1065, and the Third Circuit's guidance in *Pesikan*, 83 F.4th at 227–28, the court finds that *See* Wash. Rev. Code § 9A.56.020 (2006), taken in context with Wash. Rev. Code § 9A.56.050 (2006), is indivisible. It therefore applies the categorical approach below.

---

[9] In other contexts, the Supreme Court of Washington appears to describe singular alternative means, such as "obtain[ing] control over the property or services of another ... [b]y color or aid of deception," as describing the "elements" of a theft offense. *State v. George*, 164 P.3d 506, 510 (Wash. 2007) (quoting § 9A.56.020(1)(b)) (en banc). However, given that the court has decidedly described the alternatives listed in § 9A.56.020 as "means" that do not require jury unanimity to find, the court finds that they are means, not elements. *See Woodlyn*, 392 P.3d at 1065–68.

### 2. Applying the Categorical Approach, the Court Finds Abdalla's Conviction qualifies as a Theft Offense Under 8 U.S.C. § 1101(a)(43)(G).

As explained above, there are two statutes relevant to Abdalla's conviction: the Washington third-degree theft statute under which Abdalla was convicted, Wash. Rev. Code § 9A.56.050 (2006), and the Washington statute that defines theft and offers alternative means for its commission, Wash. Rev. Code § 9A.56.020(1) (2006). *See Linehan*, 56 P.3d at 546 ("The statutes describing the degrees of theft do not provide alternative means of committing the crime, nor do they define the crime. Rather, the crime of theft is defined in terms of the alternative means of commission, in a statute separate from those defining the degrees of theft."). This structure is different from other statutes that list alternative means or elements of a single crime together, along with the specific "grading" of that crime. *See, e.g., United States v. McCants*, 952 F.3d 416, 425–27 (3d Cir. 2020) (holding that New Jersey's second-degree robbery statute, N.J. Stat. Ann. § 2C:15-1, which listed alternative elements of that crime and its grading in the same section, was divisible).

Nonetheless, the court finds another Third Circuit decision, *K.A. v. Attorney General of the United States*, to be instructive in conducting the cross-statute categorical approach it faces here. 997 F.3d at 109. There, the court analyzed whether the petitioner's conviction for second-degree robbery in New Jersey

qualified as a "theft offense" under 8 U.S.C. § 1101(a)(43)(G) by meeting each element of the federal generic theft offense, thereby making the petitioner ineligible for asylum and withholding of removal. *See id.* at 104–106.

The court recognized that, although "there are three alternative formulations of New Jersey robbery, they share a common element: each must occur during the commission of a theft." *Id.* at 109 (collecting cases). The New Jersey robbery statute at issue in that case does not define "theft." N.J. Stat. Ann. § 2C:15-1(a). So the court looked to each of the eight variations of theft New Jersey recognized at the time of the Petitioner's conviction. *K.A.*, 997 F.3d at 110 (citing the eight different types of robbery recognized in New Jersey). Since "any of these eight theft crimes could form a basis for second-degree robbery, they each [needed to] satisfy the categorical approach for robbery to qualify as a 'theft offense' under the INA." *Id.* Accordingly, the court examined each of the eight types of New Jersey theft offense to determine whether they match each of the three elements of the generic federal theft offense. *Id.* at 110–112. Finding that each offense did match the elements of the generic federal offense after applying the categorical approach, the court held that "it follows that K.A.'s conviction for second-degree robbery necessarily required satisfaction of every element of the federal generic theft offense. Thus, under the categorical approach, at the time of K.A.'s conviction in

2000, second-degree robbery in New Jersey qualified as a theft offense under the INA." *Id.* at 112.

Like in *K.A.*, any of the three types of theft listed in Wash. Rev. Code § 9A.56.020(1) could satisfy the term "theft" as used in § 9A.56.050, so they each must match the elements of the federal generic theft offense for § 9A.56.050 to qualify as a theft offense under 8 U.S.C. § 1101(a)(43)(G). *See Linehan,* 56 P.3d at 547. In their supplemental briefing, both parties urge the court to examine all three alternative means of theft listed in § 9A.56.020(1) to determine whether the "the minimum conduct criminalized" by each means matches "the federal generic definition" of theft. *K.A.*, 997 F.3d at 108–109; *see also* Doc. 32, pp. 3–10; Doc. 36, pp. 3–9. So the court will examine each of these alternative means of committing theft under Washington law to see if they categorically match the generic federal theft offense.

The categorical approach requires the court, in this instance, to compare § 9A.56.020(1) with "how 'the criminal codes of most States' and the federal government generically use 'the term "theft"''" to determine whether § 9A.56.020(1)'s alternative means of theft each contain elements that match those of the generic federal offense. *Baghdad*, 50 F.4th at 388 (quoting *Gonzales*, 549 U.S. at 189–90)) (internal quotation marks omitted). Specifically:

> For a state-law crime to fit within the federal generic definition, the minimum conduct criminalized by the state-law offense must

> categorically match the federal generic definition for that crime . . . . To satisfy that requirement, the minimum proof required for the state offense must satisfy each element of the federal generic definition.

*K.A.*, 997 F.3d at 108–109 (citations omitted). But the court's "focus on the minimum conduct criminalized by the state statute is not an invitation to apply 'legal imagination' to the state offense; there must be 'a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime.'" *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (quoting *Duenas–Alvarez,* 549 U.S. at 193). In determining whether the state crime fits within the federal definition, the court compares the generic federal offense to the elements of the state criminal statute the petitioner violated, only; it does not look to the actions that led to the relevant conviction. *Baghdad*, 50 F.4th at 388 (citing *Pereida v. Wilkinson*, 592 U.S. 224, 233 (2021)). Here, applying the categorical approach, "if the minimum proof required" for any of the three types of theft listed in § 9A.56.020(1) do not "satisfy each of the elements of the federal generic theft offense," then that type of theft is not a "categorical match," and Abdalla's third-degree theft conviction under § 9A.56.050 does not qualify as an aggravated felony. *K.A.*, 997 F.3d at 109.

The three elements of "generic theft" or "federal generic theft" are "(i) taking of property or an exercise of control over property (ii) without consent (iii) with the criminal intent to deprive the owner of rights and benefits of ownership,

even if such deprivation is less than total or permanent." *Baghdad*, 50 F.4th at 388–89 (quoting *Gonzales*, 549 U.S. at 189) (citing *K.A.*, 997 F.3d at 105) (citation modified). The court compares each generic theft element to each type of theft listed in Wash. Rev. Code § 9A.56.020(1)(b) in turn.

**i. Each Washington Theft Variety Requires the Taking of or Exercise of Control Over Property, so They All Match the First Element of Generic Theft.**

The court begins with the first element: the "taking of property or an exercise of control over property . . . ." *Id.* The first two theft categories, codified at Wash. Rev. Code § 9A.56.020(1)(a) and 9A.56.020(1)(b), meet this element by "explicitly referencing either the taking of property or the exercise of control over property." *K.A.*, 997 F.3d at 110. Under those two provisions, an individual commits theft by "wrongfully obtain[ing] or exert[ing] unauthorized control" or "obtain[ing] control over the property or services of another or the value thereof . . . ." Wash. Rev. Code § 9A.56.020(1)(a)–(b) (2006).

The third type of theft, which consists of appropriating "lost or misdelivered property or services of another, or the value thereof, with intent to deprive him or her of such property or services," also satisfies this first element. Wash. Rev. Code § 9A.56.020(1)(c). To appropriate lost or misdelivered services "means obtaining or exerting control over the property or services of another which the actor knows to have been lost or mislaid, or to have been delivered under a mistake as to

identity of the recipient or as to the nature or amount of the property." Wash. Rev. Code § 9A.56.010(2) (2006).[10] So an individual must obtain or exert control over lost or misdelivered property to appropriate that property and commit the third type of theft, and that type of theft therefore matches the first element of generic theft. *See Baghdad*, 50 F.4th at 388.

**ii. Each Washington Theft Variety Requires a Lack of Consent, So They All Match The Second Element of Generic Theft.**

The second element of generic theft is "lack of consent." *K.A.*, 997 F.3d at 111. The Third Circuit examined this element in detail in *K.A.* and ultimately held that "consent as used in the federal generic definition of theft offense means voluntary and intelligent assent, not merely assent." *Id.* at 108 (internal quotation marks omitted). Each type of theft listed Wash. Rev. Code § 9A.56.020(1) satisfies this element. The first type, prescribed at Wash. Rev. Code § 9A.56.020(1)(a), requires obtaining or exerting "*unauthorized* control" over property or services with the intent to deprive the owner of that property or those services. *See K.A.*, 997 F.3d at 111 (discussing several New Jersey theft offenses that satisfied the second element "under either meaning of consent" because they

---

[10] The court finds it appropriate to look at other Washington state definitional statutes to determine whether Wash. Rev. Code § 9A.56.020 matches the generic theft definition for the purpose of conducting the categorical approach. *See Baghdad*, 50 F.4th at 389 (examining a Pennsylvania statute that provided a definition of the phrase "full retail value," 18 Pa. Cons. Stat. § 3929(f), to determine whether Pennsylvania's retail-theft statute, 18 Pa. Cons. Stat. § 3929(a)(1), met the intent element of the generic theft offense).

criminalized, for example, the "unlawful taking, [exerting] unlawful control over, or [engaging in an] unlawful transfer" of property or services, N.J. Stat. Ann. § 2C:20-3).

The second type, set forth in Wash. Rev. Code § 9A.56.020(1)(b), specifies theft committed "[b]y color or aid of deception." "Theft crimes predicated on deception or coercion would be committed without voluntary and intelligent assent—in satisfaction of the [second generic theft] element." 997 F.3d at 111. So Wash. Rev. Code § 9A.56.020(1)(b) satisfies the lack-of-consent element as well.

The third and final type of Washington theft, which addresses the appropriation of "lost or misdelivered property or services," also matches the second element. Wash. Rev. Code § 9A.56.020(1)(c). In *K.A.*, the Third Circuit considered whether a New Jersey statute that criminalized the knowing "conver[sion]" of property "lost, mislaid, or delivered under a mistake . . ." met the lack-of-consent element. 997 F.3d at 111. The court found that this statute matched the generic theft offense because "lost, mislaid, or delivered under a mistake is not a voluntary and intelligent assent." *Id.* Looking at similar statutory language here, the court reaches the same conclusion as to Wash. Rev. Code § 9A.56.020(1)(c).

**iii. Each Washington Theft Variety Requires the Criminal Intent to Deprive the Owner of Rights and Benefits of Ownership, so They All Match the Third and Final Element of Generic Theft.**

The third element of generic theft requires "the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *Baghdad*, 50 F.4th at 388–89. "For purposes of the federal generic theft offense, criminal intent encompasses any 'blameworthy' mental state." *K.A.*, 997 F.3d at 111 (quoting *Elonis v. United States*, 575 U.S. 723, 734 (2015)). In analyzing the New Jersey statutes at issue in *K.A.*, the Court recognized that the New Jersey Supreme Court has held that theft is a specific intent crime, and that, "[c]onsistent with that assessment, each [New Jersey] theft crime requires a criminal mental state among its elements." *Id.* at 111–12 (first citing *State v. Lopez*, 900 A.2d 779, 784 (N.J. 2006); then citing *State v. Mejia*, 662 A.2d 308, 316 (N.J. 1995) (addressing each New Jersey statute at issue parenthetically).

Similarly, each variation of theft described in Wash. Rev. Code § 9A.56.020(1) contains the following intent-related language: "with intent to deprive him or her of such property or services." Wash. Rev. Code § 9A.56.020(1)(a)–(b); *see also State v. Wagner-Bennett*, 200 P.3d 739, 742 (Wash. Ct. App. 2009) (referring generally to the "intent element of the offense of theft").

Therefore, the court finds all three variations match the third element of the generic offense.

All three types of theft listed in Wash. Rev. Code § 9A.56.020(1)(a)–(c) contain, or match, the three elements of the federal generic theft offense. *Baghdad*, 50 F.4th at 388–89. Any of those types of theft could have served as the basis for Abdalla's third-degree theft conviction under Wash. Rev. Code § 9A.56.050 (2006). So Abdalla's third-degree theft conviction "necessarily required satisfaction of every element of the federal generic theft offense." *K.A.*, 997 F.3d at 112 (holding that, because each New Jersey theft crime that could have formed the basis for a second-degree robbery conviction required all the elements of a federal generic theft offense, the second-degree robbery conviction likewise required satisfaction of every element of the federal generic theft offense and qualified as a theft offense). Therefore, Abdalla's third-degree theft conviction under Wash. Rev. Code § 9A.56.050 qualifies as a "theft offense" under 8 U.S.C. § 1101(43)(G). *See id.*; *Baghdad*, 50 F.4th at 389.

**3. The Washington Statute's Inclusion of The Term "Services" in Its Definition of Theft Does Not Alter the Court's Categorical Analysis.**

Abdalla primarily argues that his third-degree theft conviction under Wash. Rev. Code § 9A.56.050 (2006) does not qualify as a "theft offense" under 8 U.S.C. § 1101(43)(G) because Wash. Rev. Code § 9A.56.020 (2006) criminalizes the theft

of services as well as property, and the generic federal definition of theft does not cover the theft of services. (Doc. 27, pp. 7–15; Doc. 32, pp. 7–10.) Thus, all of Washington's theft variations "criminalize[] acts that are not normally considered theft," *Baghdad*, 50 F.4th at 388, so under the categorical approach, his conviction does not qualify as an aggravated felony. (*See id.*)

Abdalla's argument echoes the court's reasoning in *Juarez–Gonzalez*, 451 F. App'x. at 393. There, the court held that the Washington theft-defining statute was broader than the model federal offense in part because it criminalized theft of services, so the defendant's third-degree theft conviction did not qualify as an aggravated felony. *Id.*[11] But the Third Circuit has recognized, in several cases applying the categorical approach, that the generic federal theft offense covers the theft of services as well as property. In *Ilchuk v. Attorney General of the United States*, the Third Circuit held that the petitioner's conviction under Pennsylvania's theft of services statute, 18 Pa. Cons. Stat. § 3926(b), qualified as a conviction for a theft offense under 8 U.S.C. § 1101(a)(43)(G) because the Pennsylvania statute "requires the taking or exercise of control over something of value knowing that its

---

[11] The court also reasoned that the Washington statute was broader than the generic federal offense because it criminalized "theft by deception and theft by fraud." *Juarez–Gonzalez*, 451 F. App'x. at 393 (discussing Wash. Rev. Code § 9A.56.020(1) (1998)). But as the court explained above, the Third Circuit has recognized that those types of theft fall within the generic federal theft because they are committed without the consent of the victim where consent means "voluntary and intelligent consent." *K.A.*, 997 F.3d at 108 (internal quotation marks omitted).

owner has not consented." 434 F.3d 618, 623 (3d Cir. 2006). Similarly, in *K.A.*, the court held that New Jersey's theft of services statute met the "taking of property or exercise of control over property" element of the generic federal theft offense, "not because services are property, but because it is through services that property in the form of compensation for those services or entitlement to those services is unlawfully obtained or diverted." 997 F.3d at 111 (citing N.J. Stat. Ann. § 2C:20-8(a), (b)).[12]

Based on Third Circuit precedent, the court finds that the inclusion of "services" as well as "property" in Wash. Rev. Code § 9A.56.020 (2006) does not alter the categorical analysis performed above. *See Heard v. Barr*, 766 F. App'x 612, 619 (10th Cir. 2019) (recognizing a circuit split on the issue of whether theft of services is "covered under the federal generic definition of the offense" but ultimately siding with the circuits, including the Third, that have concluded that it does).

**B. Abdalla was Sentenced to One Year of Incarceration, so His Third-Degree Theft Conviction Qualifies as an Aggravated Felony.**

Abdalla's third-degree theft conviction under Wash. Rev. Code § 9A.56.050 (2006) qualifies as a "theft offense" under 8 U.S.C. § 1101(a)(43)(G), but the

[12] Abdalla argues that "[t]he New Jersey statute at issue in *K.A.* materially differs from Washington's theft statute, most notably because it does not criminalize the theft of services." (Doc. 27, p. 14.) But one of the several statutes the Third Circuit analyzed in that case criminalized theft of services. *K.A.*, 997 F.3d at 111 (citing N.J. Stat. Ann. § 2C:20-8(a), (b)).

court's analysis does not end there. Only theft offenses "for which the term of imprisonment [sic][13] at least one year" qualify as aggravated felonies under § 1101(a)(43)(G). Another provision of that statute defines "term of imprisonment" as follows:

> Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

8 U.S.C. § 1101(a)(48)(B).

In *United States v. Graham*, the Third Circuit recognized that by amending § 1101 to add the "definitional provision" at § 1101(a)(48)(B), Congress indicated that the "actual term imposed is ordinarily the definitional touchstone" when it comes to references to terms of imprisonment or sentences in § 1101(a). 169 F.3d at 790–91 (1999) (also recognizing that "[a]lthough the 1996 amendments created a typographical error by inadvertently removing the verb, there is no evidence that Congress intended to begin relying on the statutory minimum rather than the sentence actually imposed for a conviction"). And a panel of the Third Circuit noted in a non-precedential opinion that "the statute defining theft or burglary

[13] *See United States v. Graham*, 169 F.3d 787, 790–91 (3d Cir. 1999) (discussing the typographical error created by a 1996 amendment to § 1101(a)(43)(G) and holding that provision refers to the penalty "actually ordered" by the sentencing court and not the minimum possible penalty available).

offenses as aggravated felonies refers to the sentence imposed—not the time actually served—in determining whether a criminal conviction is an aggravated felony." *Mekenye v. Att'y Gen. of U.S.*, 445 F. App'x 593, 595 (3d Cir. 2011) (citing 8 U.S.C. § 1101(a)(43)(G)) (emphasizing that, under § 1101(a)(48)(B), the suspension of a sentence does not alter the court's consideration of the sentence imposed) (per curiam); *United States v. Flores-Barahona*, 313 F. App'x 562, 563 n.2 (3d Cir. 2009) ("The fact that Flores-Barahona's sentence was suspended is of no consequence.") (citing 8 U.S.C. § 1101(a)(48)(B)).

Abdalla pleaded guilty to an amended criminal complaint that charged him with Theft in the Third Degree under Wash. Rev. Code. § 9A.56.050 and Assault in the Fourth Degree under Wash. Rev. Code § 9A.36.041. (Doc. 25, ¶ 6; Doc. 16, p. 11.) The Court sentenced Abdalla to 365 days of incarceration with 335 days suspended for each count on the same day. (Doc. 25, ¶ 7; Doc. 16, p. 11.) Therefore, he was sentenced to a term of at least one year of imprisonment for his theft offense, and it does not matter that the vast majority of that sentence was suspended. 8 U.S.C. §§ 1101(a)(43)(G), (48)(B). Accordingly, his third-degree theft conviction qualifies as an aggravated felony under 8 U.S.C. § 1101(a)(43)(G).

Abdalla argues that this conclusion is incorrect for several reasons. The court addresses each in turn.

### 1. Washington's Method of Carrying Out a Suspended Sentence Does Not Change the Plain Meaning of 8 U.S.C. § 1101(a)(48)(B).

Abdalla first argues that the suspension of a sentence of confinement under Washington law is not the same thing as a "suspension of the imposition or execution of that imprisonment or sentence in whole or in part" described in 8 U.S.C. § 1101(a)(48)(B). (Doc. 19, pp. 15–16.) Specifically, he claims:

> Under Washington law, when a judge imposes a "suspended sentence," it is not merely a sentence of confinement that is suspended. Rather, it constitutes a conditional sentence wherein the court retains jurisdiction over the defendant during the suspension period. If the defendant violates the terms of supervision, the court may revoke the suspension and impose the original sentence following a hearing. Wash. Rev. Code § 9.95.200-.240. (2025)

(*Id.* at 15–16.) Thus, Abdalla argues that there are two types of "non-imprisonment" sentences. (*Id.* at 19.) The first, as practiced in Pennsylvania, provides what Abdalla describes as effectively "to set a period of probation." (*Id.*) Under that approach, Abdalla claims, "[i]f one violates the conditions set in his probationary order, he is subjected to a probation revocation hearing and resentencing which might include the maximum prison sentence." (*Id.* at 19.) But if the individual meets the probation conditions, "the individual is subjected to a probation review conference, and at the conclusion of the conference, the individual is discharged." (*Id.* (citing 42 Pa. Cons. Stat. § 9774.1(f) (2024)).)

Under the second regime, Abdalla argues that a court sets a sentence of imprisonment, suspends the sentence, sets probationary terms, "and if the

individual violates those conditions, his sentence is re-examined" with the possibility of new conditions or a sentence "for a term of imprisonment [that] is generally not an automatic reinstatement of the original sentence." (*Id.*) Abdalla argues, without citation to legal authority, that although these two approaches are "substantively the same," they create disparate immigration outcomes. (*Id.*) He then argues that, under Washington's "probation/parole program . . . a sentence of confinement is imposed, but is not to be executed unless the conditions of parole are violated." (*Id.* at 20.) And "[e]ven then, the sentence of imprisonment is not automatically re-imposed, but rather the individual is referred to the sentencing board where his sentence is reconsidered and may be modified." (*Id.*) While explaining the process of parole revocation adjudication under Wash. Admin. Code § 381-70-160, he argues that the "duration of the original 'suspended' sentence, is thus the extent of the jurisdiction of the sentencing review board over the defendant and is not intended to be an actual sentence of imprisonment." (*Id.* at 20–21.)

Following this explanation, he argues that only the form differs between Pennsylvania's "straight probationary sentence" and Washington's "scheme of a suspended sentence subject to compliance and the conditions of probation," so the court should "look to the substance of the sentence and not just its superficial form." (*Id.* at 21.) At an earlier point in his brief where he first described

Washington's treatment of a suspended sentence, Abdalla notes, also without citation, that the "imposition of a sentence of confinement or new conditions of parole is not a punishment for the convicted offense, but a means to enforce compliance with the conditions of parole" because "[t]he violations which can trigger a revocation of parole need not be related in any way to the criminal charges for which the probationer was convicted." (Doc. 19, p. 14.)[14]

In response, the Government argues that Abdalla "merely compares the different statutes between Washington State and the Commonwealth of Pennsylvania . . . making no efforts to distinguish how this suspended sentence would negate the plain language of the INA." (Doc. 23, p. 24.) It claims that a suspended sentence still counts toward the one-year threshold in 8 U.S.C. § 1101(a)(43)(G), so the court should find Abdalla's third-degree theft conviction qualifies as an aggravated felony. (*Id.* at 24–26.)

Abdalla did not file a brief replying to the government's brief in opposition, but he addressed this argument in his brief in opposition to the Government's motion for summary judgment, Doc. 27, p. 22. There, he clarifies, again without citation to legal authority, that:

> A suspended sentence is a sentence that is imposed and then the sentence itself is either fully or partially withheld from execution. It is

[14] In the same section of his brief, Abdalla cites Wash. Rev. Code § 72.04A.090. But he does not explain, nor is it apparent to the court, how that statute allows an individual to argue against "the duration of" their sentence before the "Sentencing Board." (*See id.*)

> not a declaration of a sentence that is contingent on other violations which are not related to the criminal offense that might be imposed. Here, as noted in petitioner's opening brief, the imposition of the "suspended" portion of confinement do not result in the reinstatement of the sentence, but rather a hearing to determine imposition of a new sentence. Here, the supposed suspended sentence marked nothing more than the period of time that the defendant would be under the jurisdiction of the parole authorities. It was imposed with the idea that it never be served but rather that it be the period of supervision of the parole authorities.

(*Id.*) From there, Abdalla argues that the Government improperly urges the court to rely on the Board of Immigration Appeals's interpretation of the term "suspended sentence," an argument the court addresses below.

The court understands Abdalla's argument to be that, in Washington, when a court imposes a suspended sentence, it does not actually impose a suspended sentence, it merely sets a length of time for supervision, and if the defendant violates the conditions of their supervision, they may be subject to an entirely new sentence. (*See* Doc. 19, pp. 21–22; Doc. 27, p. 22 ("[The suspended sentence] was imposed with the idea that it never be served but rather that it be the period of supervision of the parole authorities.") Therefore, a suspended sentence imposed by a Washington court does not fit within the "suspension" of a sentence as that term is used in 8 U.S.C. § 1101(a)(48)(B).[15]

---

[15] Abdalla broadly argues that the Government relies too heavily on the Board of Immigration Appeals's ("BIA") interpretation of the term "suspended sentence." (Doc. 27, pp. 21–26.) That term does not appear in § 1101(a)(48)(B), it is not clear to the court where the BIA interpreted that term and the Government relied on it, and neither the court nor the Government offer deference to an agency interpretation of that term in construing the plain language of §

For reasons beyond the fact that Abdalla does not offer specific and clear explanations of authority supporting his understanding of Washington law, the court agrees with the Government on this point. The parties agree that Abdalla was sentenced to 365 days of imprisonment with 335 days of that sentence suspended. (Doc. 18-1, ¶ 3; Doc. 22, ¶ 3.) The sentencing records from the Washington state court contained in the administrative record reflect the same sentence. (Doc. 16, p. 11.) A theft offense for which the term of imprisonment is at least one year qualifies as an aggravated felony, regardless of whether a portion of that sentence was suspended by the sentencing court. 8 U.S.C. §§ 1101(a)(43)(G), (48)(B). So Abdalla's theft conviction qualifies as an aggravated felony.

Abdalla's argument fails because 8 U.S.C. § 1101(a)(48)(B), by its terms, does not require the court to examine the way in which a portion of a sentence designated as suspended was carried out. And Abdalla cites no controlling authority suggesting that the court must conduct an additional interpretive analysis that distinguishes between how different state courts manage suspended sentences;

1101(a)(48)(B). Abdalla claims that the court should not invoke deference to agency interpretations of immigration statutes under the now-overruled framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), *overruled by Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024). But even under the now-overruled *Chevron* framework, deference to an agency interpretation was not warranted unless the statute was ambiguous. *See La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Lab.*, 745 F.3d 653, 680 n.20 (3d Cir. 2014). Here, the court has not found that § 1101(a)(48)(B) is ambiguous, so it need not look to external sources of statutory meaning beyond the text.

indeed, the language of the statute alone sweeps broadly to "include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part," § 1101(a)(48)(B). *Cf. Mekenye*, 445 F. App'x at 596 ("Mekenye's sentence of three years in the custody of the Delaware Department of Correction at supervision level 5 meets this requirement regardless of the fact that it was ultimately suspended for a period of intense supervision.") (discussing 8 U.S.C. §§ 1101(a)(43)(G), (48)(B)).[16] Moreover, Abdalla does not explain why the term "suspension of the imposition or execution" of a sentence is ambiguous, and "[i]f the statutory language is unambiguous on its face, the court's inquiry is at an end." *United States v. Williams*, 903 F. Supp. 2d 292, 298 (M.D. Pa. 2012) (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997)). Abdalla's argument would require the court to narrow that statutory term to only certain types of suspended sentences without any explanation of how the text of the statute supports that reading. Therefore, Abdalla's argument does not change the court's analysis of his sentence.

[16] Abdalla argues that the Third Circuit panel decided *Mekenye* "during the Chevron era, heavily relying on the immigration judge's and BIA's interpretations in addressing statutory ambiguities, noting that the court's 'jurisdiction to review the final order of removal ... is limited.'" (Doc. 27, pp. 25–26.) But the court in that case neither found that the statute was ambiguous nor explicitly deferred to the BIA's interpretation; it merely noted that the BIA's interpretation of was "proper[]." *Mekenye*, 445 F. App'x at 596. And it referred to its limited jurisdiction to adjudicate legal questions after a finding of removal. *Id.* at 595.

### 2. Finding That Abdalla's Third-Degree Theft Conviction Qualifies as an Aggravated Felony is Not an Absurd Result.

Next, Abdalla argues that "[c]ategorizing a first (and only) retail theft of a bottle of liquor valued at $14.95 as an aggravated felony is an absurd result." (Doc. 19, p. 16.) He argues that Washington's third-degree theft offense would be considered a misdemeanor, not a felony, in most states and that his conviction should "fit within the 'petty offense' exception to admissibility for noncitizens who have been convicted of only one crime involving" moral turpitude. (*Id.* at 16–18 (citing 8 U.S.C. § 1182(a)(2)(A)(ii)(II).)

Although Wash Rev. Code § 9A.56.050 classifies theft in the third degree as a "gross misdemeanor," the Third Circuit has held at least twice that a misdemeanor conviction may qualify as an aggravated felony under 8 U.S.C. § 1101(a)(43) when it results of a sentence of at least one year. *Graham*, 169 F.3d at 793 (holding that a misdemeanor petit larceny offense qualified as an aggravated felony under § 1101(a)(43)(G)); *Biskupski v. Att'y Gen. of U.S.*, 503 F.3d 274, 281 (3d Cir. 2007) (holding that a "misdemeanor conviction for aiding and abetting alien smuggling under 8 U.S.C. § 1324(a)(2)" qualified as an aggravated felony under § 1101(a)(43)(N)). Abdalla was convicted of a crime classified as a gross misdemeanor under state law, but because that crime matched the federal generic theft definition and he was sentenced to a year of incarceration for committing that crime, Doc. 16, p. 11, his conviction qualifies as an aggravated felony under 8

U.S.C. § 1101(a)(43)(G). This is the result required by application of the relevant statutory provisions.

**3. The Court Applies the Law as it Existed at the Time of Abdalla's Conviction, so Washington's Lowering of the Maximum Sentence For a Gross Misdemeanor Offense Has no Impact on The Court's Analysis.**

When Abdalla was convicted of third-degree theft in 2007, the maximum sentence for a gross misdemeanor like third-degree theft was "imprisonment in the county jail for a maximum term fixed by the court of not more than one year, or by a fine in an amount fixed by the court of not more than five thousand dollars, or by both such imprisonment and fine." Wash. Rev. Code § 9A.20.010(2) (2006).[17] In 2011, the Washington State Legislature recognized that the one-year maximum sentence for a gross misdemeanor in Washington "can, under federal law, result in the automatic deportation of a person who has lawfully immigrated to the United States, is a victim of domestic violence or a political refugee, even when all or part of the sentence to total confinement is suspended." 2011 Wash. Sess. Laws 831–32. So it amended Wash. Rev. Code § 9A.20.010(2) and capped the maximum sentence for a gross misdemeanor at 364 days. *Id.* at 836; *see* Wash. Rev. Code § 9A.20.010(2) (2026). The court refers to this change as the "2011 amendment."

[17] The Washington State Legislature did not amend § 9A.20.010(2) between 2006 and 2008. *Compare* Wash. Rev. Code § 9A.20.010(2) (2006) *with* Wash. Rev. Code § 9A.20.010(2) (2008).

Because of the 2011 amendment, Abdalla argues that his 365-day sentence for third-degree theft, a gross misdemeanor, was "legally impossible." (Doc. 19, p. 21.) He argues that the 2011 amendment retroactively applies to his 2007 conviction because the Washington State Legislature "clearly expressed its intent for retroactivity" in two ways. (Doc. 27, p. 16.) First, the legislature noted in its findings that the amendment sought to "cure the inequity" caused by the previous 365-day maximum gross misdemeanor sentence's federal immigration law consequences. (*Id.* (quoting 2011 Wash. Sess. Laws 831–32).) Second, he argues that the legislature made the retroactive application of the amendment clear by stating, at the beginning of Wash Rev. Code § 9A.20.021, that the statute provides "[m]aximum sentences for crimes committed July 1, 1984, and after." (*Id.* at 17.) And because the amendment "reduces punishment and confers a benefit to remedy an acknowledged injustice," Abdalla adds, it falls within an exception to the general presumption against the retroactive application of statutes. (*Id.* at 18–21.)

In reply, the Government argues that it never contended that Washington's 2011 amendment did not apply retroactively. (Doc. 29, p. 17 n.5.) Instead, its primary argument is that, regardless of any post-conviction change in state law, the court applies state law as it existed at the time of the petitioner's conviction to determine the immigration consequences that arise from that conviction. (Doc. 26, pp. 27–28; Doc. 29, pp. 17–18.)

Even assuming that a state's retroactive amendment of a sentencing statute in reaction to federal immigration law could impact the immigration consequences of a state conviction, there are three problems with Abdalla's claim that the amendment is, in fact, retroactive. First, although the legislature's findings discuss the legislature's intention to "cure" an "iniquity" by amending the gross misdemeanor statute, Abdalla does not point to any specific language indicating an intention to apply that amendment retroactively, and none is apparent to the court. 2011 Wash. Sess. Laws 831–32; Wash Rev. Code § 9A.20.021(2). Second, the introductory provision of Wash. Rev. Code § 9A.20.021 that states that the statute prescribes "[m]aximum sentences for crimes committed July 1, 1984 and after," appeared in versions of the statute before 2011, so it does not suggest that the 2011 amendment, specifically, applies retroactively. *See* Wash. Rev. Code § 9A.20.021 (2006). Third, Abdalla claims that "Respondents argue that because the general 'principle [is] against retroactive [application of] legislation . . . unless Congress [—in this case, the legislature of the state of Washington—] has unambiguously instructed retroactivity.' Resp't's Opp'n Br. at 22 . . . it should not be enforced. Petitioner agrees." (Doc. 27, p. 16.) But nowhere in the four briefs it filed related to the motions for summary judgment in this case did the Government make that argument. (*See generally* Docs. 23, 26, 36 (acknowledging Abdalla's arguments about retroactivity at some points but not arguing that the presumption against

retroactivity bars Abdalla's legal impossibility argument); Doc. 29, p. 17 n.5 (noting that the Government never made this argument).)

Abdalla's argument that the 2011 amendment made his third-degree theft conviction legally impossible ultimately fails because the court must analyze the immigration consequences of a criminal conviction based on state law as it existed at the time of that conviction. The Third Circuit has stated that "[t]he immigration consequences of a criminal conviction are typically fixed at the time of conviction and not altered by post-conviction developments in the law." *Khan v. Att'y Gen. of United States*, 979 F.3d 193, 201 (3d Cir. 2020) (examining the application of the "stop-time" rule in the cancellation-of-removal context) (collecting cases). And "[a]s federal law governs immigration matters, it is federal law that prescribes what effect, if any, a state's repeal or amendment of its criminal laws has on immigration proceedings." *Id.* at 201 n.7 (explaining that, in *Acosta v. Ashcroft*, 341 F.3d 218, 223 (3d Cir. 2003), the Third Circuit held that a state legislature could not determine how the term "conviction" is interpreted under federal law); *see also Vasquez v. Garland*, 80 F.4th 422, 427 (2d Cir. 2023) (discussing the New York legislature's decision to reduce the maximum possible sentence for Class A misdemeanors to 364 days and holding that immigration consequences of a conviction are "affix[ed] . . . to the alien's offense when it was committed, rather than to how it may be viewed by the legislature at some future point.").

The court finds that two conclusions flow from these premises. First, the court looks to the maximum sentence for a gross misdemeanor under Washington law at the time of Abdalla's conviction for the purpose of determining whether he received at least a one-year-long sentence of imprisonment. Second, even if Washington intended for the 2011 amendment to apply retroactively, that does not automatically alter the court's evaluation of the immigration consequences of Abdalla's conviction for third-degree theft.

The Third Circuit's analysis in *Martinez v. Att'y Gen.*, 906 F.3d 281, 287 (3d Cir. 2018) supports the court's decision to analyze Abdalla's conviction according to the maximum gross misdemeanor sentence at the time of his conviction, and the sentence he actually received. In that case, the petitioner argued that, applying the categorical approach, his conviction did not qualify as a controlled-substance offense. *Martinez*, 906 F.3d at 287. His argument rested on a discrepancy between state and federal controlled substance lists, but that discrepancy did not exist at the time of his conviction, because the federal drug schedules "narrow[ed]" after his conviction. *Id.* ("Martinez's argument depends on the premise that the present lists control, not the lists in effect when he was convicted.") The court ultimately held that the categorical approach required it to "compare the schedules

at the time of conviction." *Id.*[18] *Martinez* therefore indicates that the court should look to state and federal law as they existed at the time of the conviction at issue. *See id.*

Applying similar principles, the court finds, considering Washington state law as it existed at the time of Abdalla's third-degree theft conviction, Abdalla was sentenced within the statutory maximum for a gross misdemeanor, and the court sentenced him to one year of incarceration. *See* Wash. Rev. Code § 9A.20.021 (2006).

## CONCLUSION

As the court explained above, Abdalla's conviction for third-degree theft under Wash. Rev. Code. § 9A.56.050 (2006) qualifies as an aggravated felony under 8 U.S.C. § 1101(a)(43)(G). An applicant for naturalization cannot demonstrate good moral character if they have ever been convicted of an aggravated felony. *Id.* § 1101(f)(8). Good moral character is necessary for naturalization. *Id.* § 1427(a). Abdalla therefore cannot meet his burden to prove

[18] Abdalla argues that *Khan* addressed a statute that "broadly eliminated criminal liability for the underlying conduct" unlike the "minor and precise adjustment to the statutory scheme" at issue here. (Doc. 27, pp. 19–20.) The statutory specifics in *Khan* are not crucial to the court's analysis; the court cites that case for its recitation of the general principal that courts look to state law as it existed at the time of an individual's conviction to determine the immigration consequences of that conviction. 979 F.3d 193. Abdalla also argues that *Martinez* "did not involve a change in the law" and is therefore inapposite. (Doc. 27, p. 20.) But *Martinez* explicitly involved a change in federal drug classifications that took place between the petitioner's state conviction and the initiation of his removal proceedings. 906 F.3d 287.

that he is entitled to naturalization, and USCIS properly denied his application. *See Haser*, 2020 WL 907155, at *5.

Therefore, the court will deny Abdalla's motion for summary judgment, Doc. 18, grant the government's motion for summary judgment, Doc. 24, and deny Abdalla's petition for de novo review of his naturalization application, Doc. 1. An order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: August 28, 2026